DMP:FJN/CEB
F.# 2020R01107

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM USER ID @OURLIVESMATTERNYC THAT IS STORED AT A PREMISES CONTROLLED BY FACEBOOK INC. | **APPLICATION FOR A SEARCH WARRANTS FOR INFORMATION IN POSSESSION OF A PROVIDER**<br><br>Case No. 21-mj-779 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, DAVIDE M. GOMES, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Task Force Officer with the Federal Bureau of Investigation ("FBI") and have been since November 2019.  I am also a Detective with the New York City Police Department ("NYPD") and have been since January 2017.  I am currently assigned to the FBI's Joint Terrorism Task Force.  I have participated in investigations involving firearms and the execution of search warrants for premises, electronic devices, and electronic accounts, including social media accounts.

2.      I make this affidavit in support of a renewed application for a search warrant for information associated with an Instagram account bearing user identification @ourlivesmatternyc (the "Instagram Account") that is stored at a premises owned, maintained, controlled, or operated by Facebook Inc. (hereinafter, "Facebook").  This application was presented to the Honorable Vera M. Scanlon on July 1, 2021, and Judge Scanlon issued an order denying the application without prejudice to renewal.  See Case No. 21-MC-280-PK.  The

information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber(s) or customer(s) associated with the Instagram Account.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the Instagram Account contains evidence relevant to possible violations of 18 U.S.C. § 922(g)(1) (possession of firearm by convicted felon) (the "SUBJECT OFFENSE") by Shermaine Laster ("LASTER"),.  Therefore, there is probable cause to search said Instagram Account, as further described in Attachment A, for the evidence described in Attachment B.

## PROBABLE CAUSE

### A.  Shermaine Laster

5.      LASTER is a 45-year-old U.S. citizen who resides in Brooklyn, New York.  As explained in more detail below, LASTER is a convicted felon and there is probable cause to believe that LASTER has been in recent possession of firearms in New York, Texas, and elsewhere, in violation of federal law prohibiting felons from possessing firearms.

6.      On or about June 23, 2021, the Honorable Renee Toliver, United States Magistrate Judge for the Northern District of Texas signed a criminal complaint and arrest

warrant charging LASTER with possessing a firearm on or about October 24, 2020, after having

been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). On June 25, 2021, LASTER

was arrested at John F. Kennedy International Airport ("JFK").

**B. The Investigation Establishes That Laster Has Illegally Possessed Firearms on Multiple Occasions Since October 2020**

7.　　On or about October 1, 2020, the NYPD learned that an individual had posted

photographs of firearms to Instagram using the username @ourlivesmatternyc (the "Instagram

Account"). Records obtained from Instagram indicate that the Instagram Account is registered to

an individual named "Big Mike" and that the account is connected to telephone number (718)

536-9415 (the "9415 Number"). As described below, LASTER has identified the 9415 Number

as his.

8.　　Law enforcement officers reviewed publicly available postings on the Instagram

Account and observed the following:

　　　　a. A photograph of a dark-colored handgun next to two remote controls on what

　　　　appears to be a couch. The user of the Instagram Account captioned the

　　　　photograph, "Sitting watching TV smoking my cigar! I'm ready for WAR!!!!!"

　　　　The image posted by the user of the Instagram Account is below.



b. A photograph of multiple handguns. The user of the Instagram Account captioned the image, "No games!!! Proud boys, KKK, skin heads, white supremacy I'm not playing absolutely NO GAMES with your kind!! I just wish MY ppl wake up and unity before it's too late. (Black toys) good to fight in the dark!!" The image posted by the user of the Instagram Account is below.



c.  A photograph of multiple handguns.  The user of the Instagram Account captioned the photograph, "Black Power!"  The image posted by the user of the Instagram Account is below.



9. On or about October 24, 2020, the user of the Instagram Account posted multiple photographs and videos of an individual holding and shooting firearms. Some of the images and videos on the Instagram Account depicted the individual firing an assault rifle and a handgun at what appears to be a shooting range, including the following:

    a. Two photographs depicting an individual holding what appear to be an assault rifle and a handgun. The user of the Instagram Account captioned the photographs, "Get ready ppl!!!! WAR is coming!!! Brought my baby out and connected with big boy AK-47 AR-15 #stopsingingandstartswinging #outlivesmatter #fight #war #black #revolution #itson #justice #free #equality."

The images posted by the user of the Instagram Account also depict the individual wearing a dark-colored New York Yankees baseball cap, a dark-colored bandanna and a light-colored t-shirt bearing the message, "I CAN'T BREATHE."





b. Two videos depicting the same individual firing what appears to be the same assault rifle and a handgun at paper targets. In one of the videos, the individual states, "now I'm going to be demonstrating how to take out your opponent." A screenshot from one of the videos is below.



10.    Based on information in one of the videos posted, law enforcement officers were able to determine that the photographs and videos were taken at a gun range in Dallas, Texas (the "Gun Range") on or about October 24, 2020. Specifically, one of the paper targets in the videos bears a logo in the shape of the Texas and bears the name of the Gun Range.

11.    Law enforcement officers contacted the Gun Range and learned that LASTER visited the Gun Range on or about October 24, 2020 and fired the weapons depicted in the photographs and videos. The Gun Range provided the FBI with a "Firearms Eligibility Experience & Range Safety Waiver" that LASTER signed on or about October 24, 2020, prior to using the facilities at the Gun Range. The waiver form states, among other things, "[i]t is unlawful for a felon or illegal alien to possess or rent firearms or ammunition." LASTER checked a box on the waiver form stating, "I agree." The waiver form also asked LASTER,

"Have you ever been convicted of a felony?" LASTER responded, "No" on the waiver form. In addition to answering the above-described questions, LASTER provided the Gun Range with his home address in Brooklyn, New York. LASTER also provided the Gun Range with information from his New York state identification card, an e-mail address, and a telephone number, which was the 9415 Number.

12.     The Gun Range provided the FBI with photographs of LASTER, which were taken as he signed the waiver form. The Gun Range also identified that one of the firearms that LASTER fired at the range on or about October 24, 2020 was a Nodak Spud LLC, Model NDS-3, 7.62x39 caliber rifle.

13.     I have compared the photographs of the individual possessing firearms in the above-described photographs and videos to known photographs of LASTER, including LASTER's New York State identification card, and determined that LASTER appears to be the individual depicted in the photographs.

14.     Additionally, law enforcement officers obtained airline travel records for LASTER indicating that he traveled from New York City to Dallas, Texas from on or about October 23 to on or about October 26, 2020.

15.     On or about November 23, 2020, law enforcement officials observed that the user of the Instagram Account publicly posted additional photographs of LASTER in possession of additional firearms on the Instagram Account, as follows:

    a.  A photograph that depicts LASTER holding what appears to be a dark-colored Smith & Wesson AR-15 assault rifle with a telescope. In the photograph LASTER is wearing a dark-colored cap with the Brooklyn Nets logo and a light-

colored t-shirt with a teddy bear on it.  The image posted by the user of the Instagram Account is below.



b. A photograph that depicts LASTER holding a handgun inside what appears to be an automobile.  In the photograph, LASTER is wearing the same dark-colored Brooklyn Nets hat and gray teddy bear t-shirt.  The image posted by the user of the Instagram Account is below:



c. Two photographs that depict LASTER holding a rifle with what appears to be a sniper-like telescope. In these photographs LASTER is again wearing the same dark-colored Brooklyn Nets cap and light-colored teddy bear t-shirt described above. The images posted by the user of the Instagram Account are below:

 

d. An image that depicts LASTER standing outdoors holding a dark-colored assault rifle wearing the dark-colored Brooklyn Nets cap and the light-colored teddy bear t-shirt. The user of the Instagram Account captioned the image, "I am ready for war!!!! Just trying to figure out who I am at WAR with. #leadership #hate #haters #justice #vengeance #serious #nogames #world #loveyourself." The image posted by the user of the Instagram Account is below.



ourlivesmatternyc I am ready for war!!! Just trying to figure out who I am at WAR with. #leadership #hate #haters #justice #vengeance #serious #nogames #world #loveyourself

e. An image that depicts LASTER standing outdoors in the same location holding two dark-colored assault rifles wearing the dark-colored Brooklyn Nets cap and the light-colored teddy bear t-shirt. The user of the Instagram Account captioned the image,

When 'they' light I be quiet.!! When "they" bring lies to try to destroy my name I be quiet!! When I strike back I'm not for black lives, when I stand as a man, I'm not for black lives, when I strike back because of lies with no facts, I'm then violent and aggressive. I am about to shut this movement down in NYC until we get rid of all the fakes, liars, snitch, bullies, who have been messing this movement up!!! Serving notice right now, take it how you want, but I have my list and don't run to the police when this crap get addressed, when fighting to abolish a system or gain freedom we are gonna have ppl tho feel thye need to stop the mass from pushing forward. I will not be moved!! Those who troll I know who you are, those who say "I don't have nothing to do with it" I know who you are, quit playing with grown men."

13

An image of the photograph posted by the user of the Instagram

Account is below.



16.    Law enforcement officers obtained airline travel records for LASTER indicating

that he traveled from New York City to Augusta, Georgia from on or about November 22, 2020.

17.    On or about December 4, 2020, law enforcement observed a video publicly posted

on the Instagram Account in which LASTER is depicted sitting in what appears to be the interior

of a home.  Ruffled, green colored drapes are visible in the background behind LASTER, as well

as what appears to be a blanket with stripes of multiple colors.  The sound of gunshots can be

heard on the video.  After the gunshots, LASTER is depicted on the video looking out the

window with a handgun in his hand.  The video is captioned, "How you react when you hear gun

shots!"  Based on my review of the video, it appears to have been initially posted on TikTok,

which is a social media application that permits users to upload short videos.  The video bears

markings (which can be seen in the screenshots below) indicating that it was posted on a TikTok

account called @lastermike ("TikTok Account 1").  In addition, as noted above, the Instagram

Account is registered in the name "Big Mike."  Screenshots from the video are posted below"





18.     In or about April 2021, the NYPD received a citizen complaint against LASTER from an individual (the "Complainant").  The Complainant stated that beginning in December 2020, LASTER, who the Complainant also knew as "Big Mike," had threatened to kill the Complainant for having filed a sexual abuse complaint against him.  Specifically, the Complainant reported that LASTER sent the Complainant multiple pictures of himself holding several firearms and then called the Complainant to threaten to kill her.  The Complainant further reported that on or about April 15, 2021, LASTER called the Complainant and stated, in sum and substance, "I'm going to kill you bitch.  Your head soon will be on a platter."  The Complainant also reported that on or about April 21, 2021, LASTER called her and stated, in sum and substance, "Yeah bitch I'm outside, I have that AR I'm gonna knock your head off your neck." Based on my training and experience, an "AR" refers to an AR-15 assault rifle.  Based on my

knowledge of the investigation, I know that the Complainant resides in the Eastern District of New York.  Therefore, when LASTER told the Complainant that he was "outside" with an "AR," I believe that LASTER was indicating to the Complainant that he was in possession of an assault rifle outside her home in the Eastern District of New York.

19.     The Complainant provided the NYPD with copies of the images that LASTER sent to the Complainant.  The images depict LASTER holding firearms.  Some of the images indicate that the photographs were posted to a TikTok account bearing the username @bigmike0626 ("TikTok Account 2").  Images of the photographs are below:








20.　　I have reviewed Certificates of Disposition obtained from Kings County Supreme Court. These documents reveal, among other things, that LASTER was convicted on or about April 28, 2000, for criminal possession of a weapon in the second degree, in violation of New York Penal Law § 265.03, which is punishable by more than one year of imprisonment. LASTER was sentenced to 42 months' imprisonment for this offense. The documents further reveal, among other things, that LASTER was convicted on or about May 18, 1999, for robbery in the third degree, in violation of New York Penal Law § 160.05, which is punishable by more than one year of imprisonment.

**C. Probable Cause to Search the Instagram Account**

21.     Based on my training and experience, Instagram is a social media application that permits its users to upload photographs and videos.  In some instances, the photographs and videos contain metadata indicating where and when the photographs were taken and/or uploaded.

22.     As set forth above, there is probable cause to believe that LASTER is the individual depicted in the images and the one who uploaded the images described herein to Instagram.  As a result, there is probable cause to believe that the Instagram Account contains evidence, fruits, and instrumentalities of the SUBJECT OFFENSE.

23.     Accordingly, there is probable cause to search the Instagram Account for evidence of the SUBJECT OFFENSE and for additional information relating to the Instagram Account.

## INFORMATION ABOUT INSTAGRAM

24.     Instagram is a service owned by Facebook, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

25.     Facebook collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account

number, and other personal identifiers. Facebook keeps records of changes made to this information.

26.     Facebook also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

27.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

28.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Facebook maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Facebook and third-party websites and mobile apps.

29.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to

avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

30.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Facebook to access the contact lists on their devices to identify which contacts are Instagram users. Facebook retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Facebook to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

31.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

32.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Facebook's servers.

33.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear

22

on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

34. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Facebook's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

35. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

36. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

37. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and

retains payment information, billing records, and transactional and other information when these services are utilized.

38.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Facebook retains records of a user's search history and followed hashtags.

39.    Facebook collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Facebook to personalize and target advertisements.

40.    Facebook uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Facebook maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

41.    In some cases, Instagram users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

42.     For each Instagram user, Facebook collects and retains the content and other

records described above, sometimes even after it is changed by the user (including usernames,

phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios

and links).

43.     In my training and experience, evidence of who was using Instagram and from

where, and evidence related to criminal activity of the kind described above, may be found in the

files and records described above.  This evidence may establish the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the United States to

establish and prove each element or, alternatively, to exclude the innocent from further

suspicion.

44.     For example, the stored communications and files connected to an Instagram

account may provide direct evidence of the offenses under investigation.  Based on my training

and experience, instant messages, emails, voicemails, photos, videos, and documents are often

created and used in furtherance of criminal activity, including to communicate and facilitate the

offenses under investigation.

45.     In addition, the user's account activity, logs, stored electronic communications,

and other data retained by Facebook can indicate who has used or controlled the account.  This

"user attribution" evidence is analogous to the search for "indicia of occupancy" while executing

a search warrant at a residence.  For example, subscriber information, email and messaging logs,

documents, and photos and videos (and the data associated with the foregoing, such as geo-

location, date and time may be evidence of who used or controlled the account at a relevant time.

As an example, because every device has unique hardware and software identifiers, and because

every device that connects to the Internet must use an IP address, IP address and device identifier

information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

46. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

47. Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, the instant messages and postings may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation. Therefore, Facebook's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

48. Based on the foregoing, I request that the Court issue the proposed search warrant.

49. This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is a "district court of the United States . . . that . . . has jurisdiction over the offense being investigated[.]" 18 U.S.C. § 2711(3)(A)(i).

50.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

/s/ Davide M. Gomes
Davide M. Gomes
Task Force Officer
Federal Bureau of Investigation


Subscribed and sworn to before me by telephone on July 8, 2021:


s/Robert M. Levy

THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## **ATTACHMENT A**

### **Property to Be Searched by Facebook**

This warrant applies to information associated with the Instagram user ID

@ourlivesmatternyce (the "TARGET ACCOUNT") and that is stored at a premises owned,

maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park,

California.

**Particular Things to be Seized**

I.      **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody,

or control of Facebook, Inc. ("the PROVIDER"), including any information (including any

messages, records, files, logs, or other information) that has been deleted but is still available to

the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f),

the PROVIDER is required to disclose the following information to the government for the

TARGET ACCOUNT listed in Attachment A, from October 1, 2020 to June 25, 2021:

    a.  The following wire and electronic communications associated with the TARGET
ACCOUNT:

        i.  All e-mails, communications, or messages of any kind associated with the
TARGET ACCOUNT, including stored or preserved copies of emails,
including received messages, sent messages, deleted messages, and
messages maintained in trash or other folders, as well as all header
information associated with each email, and any related documents or
attachments;

        ii.  Records or other information stored by subscriber(s) of the TARGET
ACCOUNT, related to pictures, videos, access logs, and files, and
including specifically any metadata such as EXIF data associated with any
pictures, photos, or videos;

        iii.  All photos and videos uploaded by the user ID associated with the
TARGET ACCOUNT, as well as any metadata associated therewith,
including, specifically, EXIF data;

        iv.

    b.  The following additional records and information relating to the TARGET
ACCOUNT::

        i.  All subscriber information, including the date on which the account was
created, the length of service, the IP address used to register the account,
the subscriber's full name(s), screen name(s), any alternate names, other
account names or email addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other identifying

information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the the TARGET ACCOUNT.

ii.  All IP logs, including all records of the IP addresses that logged into the account;

iii.  Any and all logs of user activity and user agent string, including:

1.  web requests or HTTP requests;

2.  any logs containing information such as the Requestor's IP address, identity and user ID, date and timestamp, request URI or URL, HTTP protocol version, referrer, and other user agent string information;

3.  login tracker logs;

4.  account management logs; and

5.  any other information concerning other email or social media accounts accessed, or analytics related to the TARGET ACCOUNT.

iv.  All records related to authenticating the user of the TARGET ACCOUNT, including use of two-factor authentication or App passwords used to allow access via a mobile device and the identity of those devices accessing the TARGET ACCOUNT;

v.  Any information identifying the device or devices used to access any TARGET ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifiers, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"),

International Mobile Equipment Identities ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA"), and any other information regarding the types of devices used to access each TARGET ACCOUNT or other device-specific information; and

vi. Any information showing the location of the user of the TARGET ACCOUNT, including while sending or receiving a message using a TARGET ACCOUNT or accessing or logged into a TARGET ACCOUNT.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm), involving Shermaine Laster and occurring after September 1, 2020.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.